UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BAREFOOT CONTESSA PANTRY, LLC, INA GARTEN and INA GARTEN, LLC,<br><br>             Plaintiffs,<br><br>             v.<br><br>AQUA STAR (USA) CO., CONTESSA PREMIUM FOODS, INC., O.F.I. IMPORTS, INC., and RED CHAMBER CO.,<br><br>             Defendants. | 15 Civ. 1092 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Plaintiffs Barefoot Contessa Pantry, LLC, Ina Garten and Ina Garten, LLC*

# TABLE OF CONTENTS

**Page**

Preliminary Statement..................................................................................................1

Statement of Facts.......................................................................................................4

    Ina Garten and Barefoot Contessa .........................................................................4

    The License with Contessa Premium.......................................................................5

    OFI's Acquisition of Contessa Premium and the Sell-Through Agreement .....................8

    Defendants' Unlawful Activities .............................................................................9

    Actual Confusion and Irreparable Harm...............................................................10

Argument .................................................................................................................11

I.      BAREFOOT CONTESSA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS .......................................................................................................12

    A.    DEFENDANTS' CONDUCT INFRINGES BAREFOOT CONTESSA'S TRADE DRESS AND TRADEMARK.....................................................12

        1.    Barefoot Contessa's Trade Dress and Trademark Are Valid and Entitled to Protection ......................................................................13

        2.    Defendants' Use of the Trade Dress and Trademark Is Presumed, and Likely, to Cause Confusion...........................................................15

    B.    DEFENDANTS' UNAUTHORIZED USE DILUTES THE VALUE OF BAREFOOT CONTESSA'S TRADE DRESS AND TRADEMARK .................19

    C.    DEFENDANTS BREACHED THE SETTLEMENT AGREEMENT, LICENSE AND SELL-THROUGH AGREEMENT ...........................................21

II.    BAREFOOT CONTESSA WILL SUFFER IRREPARABLE HARM IF DEFENDANTS ARE NOT IMMEDIATELY RESTRAINED .......................................22

III.   BAREFOOT CONTESSA HAS RAISED SERIOUS QUESTIONS ON THE MERITS AND THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR ...................24

Conclusion ...............................................................................................................25

Appendix Comparing Barefoot Contessa Frozen Dinner Trade Dress to CONTESSA CHEF INSPIRED Packaging ...........................................................................A1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Am. Ort, Inc.* v. *Israel*,
   No. 07 CV 2332 (KMK), 2007 WL 2049733 (S.D.N.Y. July 17, 2007)................................18

*Bath & Body Works Brand Mgmt., Inc.* v. *Summit Entm't, LLC*,
   7 F. Supp. 3d 385, 402 (S.D.N.Y. Mar. 21, 2014)................................................13

*Cadbury Beverages, Inc.* v. *Cott Corp.*,
   73 F.3d 474 (2d Cir. 1999)................................................................16

*Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*,
   696 F.3d 206 (2d Cir. 2012)...........................................................12, 14

*Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*,
   794 F.2d 38 (2d Cir. 1986)................................................................17

*Clinique Labs., Inc.* v. *Dep Corp.*,
   945 F. Supp. 547 (S.D.N.Y. 1996) .........................................................14

*Coach, Inc.* v. *O'Brien*,
   No. 10 Civ. 6071 (JPO)(JLC), 2012 WL 1255276 (S.D.N.Y. April 13, 2012) ................ 22-23

*Deere & Co.* v. *MTD Prods., Inc.*,
   860 F. Supp. 113 (S.D.N.Y. 1994), *aff'd*, 41 F.3d 39 (2d Cir. 1994).......................22

*Dunkin' Donuts Inc.* v. *N. Queens Bakery, Inc.*,
   216 F. Supp. 2d 31 (E.D.N.Y. 2001) .......................................................17

*eBay Inc.* v. *MercExchange, LLC*,
   547 U.S. 388 (2006).......................................................................22

*EnergyBrands Inc.* v. *Beverage Mktg. USA, Inc.*,
   No. 02 Civ. 3227 (JSR), 2002 WL 826814 (S.D.N.Y. May 1, 2002)...........................12, 16

*Friesland Brands, B.V.* v. *Vietnam Nat. Milk Co.*,
   228 F. Supp. 2d 399 (S.D.N.Y. 2002)......................................................19

*Fun-Damental Too, Ltd.* v. *Gemmy Indus. Corp.*,
   111 F.3d 993 (2d Cir. 1997)...........................................................12, 13

*GTFM, Inc.* v. *Solid Clothing Inc.*,
   215 F. Supp. 2d 273 (S.D.N.Y. 2002)......................................................17

*Hasbro, Inc.* v. *Lanard Toys, Ltd.*,
  858 F.2d 70 (2d Cir. 1988)................................................................................22

*Knorr-Nahrmittel A.G.* v. *Reese Finer Foods, Inc.*,
  695 F. Supp. 787 (D.N.J. 1988) .......................................................................14

*Krevat* v. *Burgers to Go, Inc.*,
  12-CV-6258 (JS) (AKT), 2014 WL 4638844 (E.D.N.Y. Sep. 16, 2014) .................19

*L & L Wings, Inc.* v. *Marco-Destin, Inc.*,
  676 F. Supp. 2d 179 (S.D.N.Y. 2009)................................................................15

*Lane Capital Mgmt, Inc.* v. *Lane Capital Mgmt, Inc.*,
  192 F.3d 337 (2d Cir. 1999)............................................................................15

*Lois Sportswear, U.S.A., Inc.* v. *Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986)........................................................................15, 18

*Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*,
  454 F.3d 108 (2d Cir. 2006)............................................................................20

*Majestic Drug Co.* v. *Olla Beauty Supply, Inc.*,
  No. 97 Civ. 0046 (LAP), 1997 WL 37955 (S.D.N.Y. Jan. 31, 1997).....................14

*Malletier* v. *Burlington Coat Factory Warehouse Corp.*,
  426 F.3d 532 (2d Cir. 2005)..............................................................11, 22, 24, 25

*Markovits* v. *Venture Info. Capital, Inc.*,
  129 F. Supp. 2d 647 (S.D.N.Y. 2001)...............................................................25

*Morningside Grp., Ltd.* v. *Morningside Cap. Grp., LLC*,
  182 F.3d 133 (2d Cir. 1999)............................................................................18

*Murjani Int'l, Ltd.* v. *Sun Apparel, Inc.*,
  No. 87 CIV. 4628 (PKL), 1987 WL 15110 (S.D.N.Y. July 31, 1987) ....................22

*N.Y. City Triathlon* v. *NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010).......................................................19, 20, 23

*N.Y. State Soc'y of Cert. Pub. Accountants* v. *Eric Louis Assocs., Inc.*,
  79 F. Supp. 2d 331 (S.D.N.Y. 1999).................................................................15

*N.Y. Stock Exch., Inc.* v. *N.Y., N.Y. Hotel, LLC*,
  293 F.3d 550 (2d Cir. 2002)............................................................................20

*Oleg Cassini, Inc.* v. *Weber's 32nd St. Corp.*,
  No. 07 Civ. 6301, 2008 WL 2780988 (S.D.N.Y. July 15, 2008) ...........................20

*Paddington Corp.* v. *Attiki Imps. & Distribs.*,
  996 F.2d 577 (2d Cir. 1993)........................................................................13, 16

iii

*Perkins School for the Blind* v. *Maxi-Aids, Inc.*,
  274 F. Supp. 2d 319 (E.D.N.Y. 2003) ...................................................................20

*Polaroid Corp.* v. *Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961)...................................................................................15

*Polymer Tech. Corp.* v. *Mimran*,
  975 F.2d 58 (2d Cir. 1992)......................................................................................18

*Power Test Petroleum Distribs.* v. *Calcu Gas, Inc.*,
  754 F.2d 91 (2d Cir. 1985)......................................................................................23

*Rado Watch Co., Ltd.* v. *ABC Co.*,
  92 Civ. 3657 (PKL), 1992 WL 142747 (S.D.N.Y. June 8, 1992) ..........................16

*Ryan* v. *Volpone*,
  107 F. Supp. 2d 369 (S.D.N.Y. 2000)...............................................................12, 15

*Salinger* v. *Colting*,
  607 F.3d 68 (2d Cir. 2010)......................................................................................22

*Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.*,
  588 F.3d 97 (2d Cir. 2009)......................................................................................20

*Stern's Miracle-Gro Prods., Inc.* v. *Shark Prods. Inc.*,
  823 F. Supp. 1077 (S.D.N.Y. 1993).......................................................................16

*Tactica Int'l, Inc.* v. *Atl. Horizon Int'l, Inc.*,
  154 F. Supp. 2d 586 (S.D.N.Y. 2001).....................................................................12

*Tecnimed SRL* v. *Kidz-Med, Inc.*,
  763 F. Supp. 2d 395 (S.D.N.Y. 2011)........................................................12, 13, 24

*Tri-Star Pictures, Inc.* v. *Unger*,
  14 F. Supp. 2d 339 (S.D.N.Y. 1998)................................................................14, 16

*Twentieth Century Fox Film Corp.* v. *Marvel Enters., Inc.*,
  220 F. Supp. 2d 289 (S.D.N.Y. 2002).....................................................................20

*U.S. Polo Ass'n, Inc.* v. *PRL USA Holdings, Inc.*,
  800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011).............................................................20

*U.S. Polo Ass'n, Inc.* v. *PRL USA Holdings, Inc.*,
  511 Fed. App'x 81 (2d Cir. 2013)...........................................................................22

*Virgin Enter. Ltd.* v. *Nawab*,
  335 F.3d 141 (2d Cir. 2003)....................................................................................17

*Warner-Lambert Co.* v. *Northside Dev. Corp.*,
  86 F.3d 3 (2d Cir. 1996)..........................................................................................25

iv

*Weight Watchers Int'l* v. *Luigino's, Inc.*,
    423 F.3d 137 (2d Cir. 2005)......................................................................................22

**STATUTES**

N.Y. Gen. Bus. Law § 360-*l* ...................................................................................20

Lanham Act, 15 U.S.C. § 1115(a) et seq. ........................................................ passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65 ...................................................................................................1, 3

Plaintiffs Barefoot Contessa Pantry, LLC, Ina Garten ("Chef Garten") and Ina Garten, LLC (collectively, "Barefoot Contessa") submit this memorandum of law in support of their motion, pursuant to Federal Rule of Civil Procedure 65, for a temporary restraining order and preliminary injunction against Aqua Star (USA) Co. ("Aqua Star"), Contessa Premium Foods, Inc. ("Contessa Premium"), O.F.I. Imports, Inc. ("OFI"), and Red Chamber Co. ("Red Chamber") (collectively, "Defendants").

### Preliminary Statement

This motion seeks immediately to halt consumer confusion intentionally caused by Defendants, which — in bad faith and without any authorization by Barefoot Contessa — are selling frozen dinners in packaging virtually, and in certain instances, precisely, identical to Barefoot Contessa's distinctive trade dress.

Barefoot Contessa is one of the best-known brands in the field of cooking and food-related products, with a reputation for excellence.  Defendants are affiliated companies, one of which purchased the assets of Barefoot Contessa's ex-licensee for frozen dinners, Contessa Premium, in mid-2014.  At the time of that purchase, Barefoot Contessa, per its rights, terminated Contessa Premium's license and declined Defendants' request for a new license. Instead, Barefoot Contessa allowed Defendants a narrow "sell-through" right to market and sell existing BAREFOOT CONTESSA frozen dinner inventory for a limited time, now long-expired.

Notwithstanding their limited, expired rights, Defendants have usurped for themselves the benefits of a Barefoot Contessa license — absent any authorization or quality control by, or payment to, Barefoot Contessa — and launched a line of CONTESSA CHEF INSPIRED frozen dinners in nearly the precise packaging as the previously licensed line.  In addition, despite being contractually bound not to manufacture new product to fill existing inventory of licensed BAREFOOT CONTESSA packages and to stop selling existing product by

the end of October 2014, Defendants are manufacturing and selling counterfeit product in the formerly licensed BAREFOOT CONTESSA packages using the BAREFOOT CONTESSA trademark. Defendants' brazen unauthorized use of Barefoot Contessa's intellectual property is intended to take unfair advantage of Barefoot Contessa's prestige and goodwill in order to market Defendants' frozen dinner line more successfully to consumers. Although they have no right to do so, and were refused the right to do so by Barefoot Contessa, Defendants will thereby obtain the benefits of the reputation and consumer goodwill that Barefoot Contessa has painstakingly built over more than 35 years, and Defendants will enjoy — for free — the benefit of being an official licensee, when in fact they are not.

Defendants' conduct — already causing massive actual confusion in the marketplace and inflicting irreparable harm on Barefoot Contessa — is a clear violation of Barefoot Contessa's intellectual property and contractual rights, and warrants immediate injunctive relief.

As an initial matter, Defendants' conduct is a classic case of trade dress and trademark infringement, as well as unfair competition under federal and New York state law. The Barefoot Contessa trade dress and BAREFOOT CONTESSA trademark are inherently distinctive and have acquired secondary meaning. Defendants' unauthorized use — selling almost the exact same products and counterfeit products in the same market — is likely to cause confusion in the marketplace. Indeed, where, as here, Contessa Premium is Barefoot Contessa's former licensee and Defendants' copying is intentional, likelihood of confusion is presumed. In any event, after even a short period of time in the marketplace, Defendants' conduct already has actually caused confusion, as evidenced by the flood of consumer complaints about Defendants' poor quality frozen dinners mistakenly directed to Barefoot Contessa.

2

Moreover, Defendants' conduct constitutes dilution of Barefoot Contessa's famous trademark and trade dress. By using virtually identical trade dress and mark, together with predatory intent to associate its products with those of Barefoot Contessa, Defendants are blurring and tarnishing Barefoot Contessa's trade dress and trademark.

Finally, Defendants are in willful breach of numerous agreements among the parties prohibiting the very conduct complained of here:  Contessa Premium agreed, on behalf of itself and its successors and assigns, never to use its mark in a manner likely to cause confusion with the BAREFOOT CONTESSA mark; and OFI and Contessa Premium agreed under the license and sell-through agreements not to manufacture new product or use Barefoot Contessa intellectual property in any way other than in connection with permitted, previously packaged sell-through goods.

As a result of Defendants' unlawful conduct, Barefoot Contessa is suffering, and if Defendants are not stopped will continue to suffer, irreparable harm to its business, brand, goodwill, and reputation — a harm presumed where, as here, Barefoot Contessa is likely to succeed on its trade dress and trademark infringement claims.  Even if not presumed, the irreparable harm here is obvious and severe.  Barefoot Contessa is a brand founded and built on a reputation for and a commitment to excellence and high-quality products — a reputation being irreparably soiled by the products Defendants are intentionally selling as, and mistakenly believed by customers to be, BAREFOOT CONTESSA products.

Accordingly, Barefoot Contessa respectfully submits that this motion for a temporary restraining order and preliminary injunction pursuant to Federal Rule of Civil Procedure 65 should be granted.

## Statement of Facts[1]

**Ina Garten and Barefoot Contessa**

Ina Garten is a celebrated author and TV personality, and the creator and driving force behind the BAREFOOT CONTESSA brand of cooking-related publications, programs, and consumer products, whose ventures over the last 35 years include a best-selling series of cookbooks, an award-winning, long-running television show on the Food Network, and popular lines of high-end food products.  (Declaration of Ina Garten ("Garten Decl.") ¶¶ 3, 4, 11, 12, 15.)

Chef Garten has been extremely careful to associate the BAREFOOT CONTESSA brand with a handful of products over which she has absolute control with respect to quality and design, to ensure that the branded products conform to her brand's core values and high quality standards.  (*Id.* ¶ 14.)  Barefoot Contessa-licensed food products have included a line of high-quality packaged mixes, marinades, sauces, and preserves that Barefoot Contessa designed and launched in conjunction with Stonewall Kitchen in 2006, and a line of frozen dinners that were manufactured and marketed nationally from 2013 to 2014 by the now-former owners of Contessa Premium.  (*Id.* ¶ 15.)

Through companies she controls, Chef Garten owns several valid and incontestable United States trademark registrations for BAREFOOT CONTESSA in connection with various goods and services associated with the BAREFOOT CONTESSA brand.  (*Id.* ¶ 17; Compl. Exs. A–C.)  Barefoot Contessa also uses distinctive design elements in connection with its branded ventures.  Its products and promotional materials almost always feature a pattern of alternating vertical stripes of equal width, in lighter and darker shades of the same color (the "Shaded Stripe Pattern").   (Garten Decl., ¶ 18; Declaration of Frank Newbold ("Newbold

---

[1]    The facts in support of this motion are set forth fully in the accompanying Declarations of Ina Garten, Frank Newbold, Theodore Libath, Donald Binotto, Michael Klunder, and the exhibits thereto.

Decl."), ¶ 4.)  In addition, all of its branded food products carry a consistent and inherently distinctive trade dress (the "Food Product Trade Dress"), developed solely by Barefoot Contessa, which principally includes:  (1) the Shaded Stripe Pattern on the top third of the package; (2) the words "barefoot contessa" printed in white on top of the Shaded Stripe Pattern; (3) a horizontal banner beneath the Shaded Stripe Pattern with the product name in all-lower case letters; (4) a photograph of the prepared product on the lower portion of the packaging that wraps around its right side; and (5) on the back of the package, quotes and tips from Chef Garten.  (*Id.*)

Barefoot Contessa and its business partners and licensees have spent millions of dollars in advertising and promoting the BAREFOOT CONTESSA brand using the Barefoot Contessa intellectual property, and its goods and services have enjoyed tremendous retail success and widespread and unsolicited press and media coverage.  (Garten Decl., ¶ 16; Declaration of Michael Klunder ("Klunder Decl."), Ex. C.)

**The License with Contessa Premium**

Contessa Premium is a manufacturer and distributor of frozen meals, which owns the registered trademark CONTESSA.  (*Id.* ¶ 20.)  In December 2011, Barefoot Contessa and Contessa Premium, recognizing the potential for consumer confusion from the parties' use of the similar trademarks, entered into a settlement and coexistence agreement regarding the use of their respective trademarks (the "Settlement Agreement"). (*Id.* ¶ 21, Ex. C.)  The parties agreed to "make all efforts to avoid confusion between their two brands," (*id.* ¶ 8), and Contessa Premium expressly agreed not to "use . . . any word or design element in combination with CONTESSA that would be likely to create consumer confusion between Contessa Premium and Garten" (*id.* ¶ 3(e)).

Following the settlement, on September 12, 2012, the parties entered into a License Agreement (the "License"), pursuant to which Barefoot Contessa granted Contessa

Premium a license to use certain of its trademarks, including BAREFOOT CONTESSA and INA GARTEN, Chef Garten's likeness and biographical information, and other intellectual property in connection with a line of frozen dinners to be manufactured and marketed by Contessa Premium. (*Id.* Ex. D.)

The design for the packaging of the BAREFOOT CONTESSA frozen dinners (the "Frozen Dinner Trade Dress") was developed and created by Barefoot Contessa, (*See* Newbold Decl., ¶¶ 3, 10; Garten Decl., ¶¶ 5, 23), a fact that Contessa Premium's then-CEO confirms. (Declaration of Donald J. Binotto ("Binotto Decl."), ¶ 4.)   Like all other BAREFOOT CONTESSA-branded product packaging, the design incorporated each element of the Food Product Trade Dress, along with several additional elements.

In particular, and as more specifically described in the Newbold Declaration, the front panel of the Frozen Dinner Trade Dress included:

- the Shaded Stripe Pattern in alternating light and dark shades of red, "barefoot contessa" printed in white on top of the stripes, a horizontal banner below the stripes featuring the product name, centered, in lower case letters and white font, and a photograph of the prepared dinner (Newbold Decl., ¶¶ 4, 7);

- above the Shaded Stripe Pattern, a silhouetted photo of Chef Garten, with a dash and the word "Ina" in white text intended to resemble her handwriting (*id.* ¶ 7); and

- on the upper left corner of the photograph of the product, a three-line description of the frozen dinner, flush-left in upper and lower case type (*id.*).

The right side of Frozen Dinner Trade Dress also displays the Shaded Stripe Pattern and continues the photograph of the prepared dinner and the horizontal banner displaying the product's name in the same type style as the front, while the left side features the nutritional panel surrounded by the Shaded Stripe Pattern. (*Id.* at ¶ 7.)  The back panel of the Frozen Dinner Trade Dress features:

- a white box, surrounded on all sides by the Shaded Striped Pattern and divided by a horizontal red line (*id.* ¶ 8);

6

- in the bottom portion of the white box, a series of step-by-step cooking directions and a photograph of the dinner being prepared in a sauté pan (*id.*);

- in the top portion of the white box, a red banner with the product name in white lowercase font, and the "barefoot contessa" brand name in red (*id.*);

- beneath the red banner, a quote from Chef Garten in black font, the phrase "Even Better:" in red text followed by a tip for improving the meal, and a dash followed by the word "Ina" in red font intended to resemble Chef Garten's handwriting (*id.*); and

- to the right of the text, a photograph of ingredients used in the product and the phrase "Nothing tastes better than a freshly cooked dinner made with great ingredients." (*id.*).

Contessa Premium specifically requested a package incorporating the elements of Barefoot Contessa's Food Product Trade Dress, in order to distinguish the product from Contessa Premium's own regular offerings. (Binotto Decl., ¶ 3.) In addition, consistent with Barefoot Contessa's general emphasis on high quality food, ingredients and goods, the License granted Barefoot Contessa strict control over the formulation and quality of goods produced pursuant to the License. (Garten Decl., ¶ 5, Ex. D (License), ¶ 4(b)(ii); Binotto Decl., ¶ 6.) Barefoot Contessa provided the recipes for the licensed products and Chef Garten spent many days at Contessa Premium's offices working with its team, and in her own kitchen, to adapt the recipes for commercial use. (Binotto Decl., ¶ 6.)

Barefoot Contessa's frozen dinner line launched in February 2013. Contessa Premium manufactured nine separate dishes in connection with the line, subject to Barefoot Contessa's strict quality and approval requirements, which it marketed using the Frozen Dinner Trade Dress and other Barefoot Contessa intellectual property. (Garten Decl., ¶¶ 24, 25.) The product line was advertised and promoted nationally — on television, in print and online — and sold nationwide in supermarket chains and retailers including Stop & Shop, Publix, Safeway and Walmart. (*Id.* ¶ 26; Binotto Decl., ¶ 8.) The product reached nearly $20 million in retail sales in less than two years and held strong market share in several key retailers. (Binotto Decl., ¶ 7.)

**OFI's Acquisition of Contessa Premium and the Sell-Through Agreement**

On or around April 30, 2014, in the face of mounting financial difficulties, Contessa Premium executed a general assignment of its assets for the benefit of creditors. (Garten Decl., ¶ 27.)  In light of the assignment, Barefoot Contessa terminated the License on May 1, 2014.  (*Id.*)

Shortly after the termination of the License, OFI, through its affiliate Aqua Star, purchased substantially all of the Contessa Premium assets, including the CONTESSA brand name and trademark.  (*Id.*)  OFI approached Chef Garten with a request for a new license to continue production of the Barefoot Contessa line of frozen dinners.  (*Id.* ¶ 28.)  Chef Garten declined because she was not comfortable that OFI — which had no experience manufacturing food items beyond packaging frozen seafood — could satisfy Barefoot Contessa's stringent quality standards.  (*Id.*)  OFI also requested permission to manufacture additional product to fill empty BAREFOOT CONTESSA frozen dinner packages that it acquired from Contessa Premium.  (*Id.*)  Chef Garten refused this request for the same reason.  (*Id.*)

Instead, OFI and Barefoot Contessa entered into a limited agreement (the "Sell-Through Agreement"), pursuant to which OFI was permitted to sell certain "Sell-Through Items" (that is, product existing in inventory and distribution channels as of termination of the License) for no more than 180 days from termination of the License — through October 28, 2014.  OFI explicitly agreed not to manufacture or sell any new product.  (*Id.*, Ex. F (Sell-Through Agreement), ¶¶ 2, 3.)  After 180 days, OFI agreed to promptly destroy, and to cause its sublicensees and customers to destroy, any remaining Sell-Through Items.  (*Id.* Ex. F, ¶ 2 (incorporating Ex. D (License), ¶ 7(b)).)  Pursuant to the Sell-Through Agreement, OFI also acknowledged that it had no right to use any of the Barefoot Contessa intellectual property.  (*Id.* Ex. F, ¶ 3.)

**Defendants' Unlawful Activities**

Although Defendants have no license or right to use any of Barefoot Contessa's intellectual property and OFI's sell-through rights have expired, Defendants currently are attempting to pass off their products as licensed BAREFOOT CONTESSA frozen dinners, in violation of Barefoot Contessa's intellectual property rights and Defendants' agreements with Barefoot Contessa.

Defendants currently are marketing a new line of frozen foods under the mark CONTESSA CHEF INSPIRED in packaging that is essentially identical to the Frozen Dinner Trade Dress of Barefoot Contessa (*see* App. to this Mem. (side-by-side descriptive comparison of BAREFOOT CONTESSA and CONTESSA CHEF INSPIRED packaging)), whose manufacture is not subject to the strict quality control standards prescribed in the License. The *only* changes to the package — which a consumer would need to hunt for — are immaterial: On the front panel, Defendants have replaced the words "barefoot contessa" with their mark "CONTESSA CHEF INSPIRED," and substituted the image of another brunette woman in the place of Chef Garten; on the back, the word "Ina" is changed to "Enjoy," written in the same font and style; and it substitutes barely noticeable differences in wording in the personalized note section. (*Id.*; *see also* Compl., Exs. H–K (side-by-side visual comparison of same for "beef stew bourguignon" and "penne pasta with five cheeses").) The packages are otherwise essentially indistinguishable.

Despite the termination of the License and the expiration of OFI's rights under the Sell-Through Agreement, Defendants also are continuing to sell, and, to manufacture and distribute, products in the previously licensed BAREFOOT CONTESSA frozen dinner packages, which prominently display the BAREFOOT CONTESSA trademark and other Barefoot Contessa intellectual property. (*See* Declaration of Theodore Libath ("Libath Decl."), ¶¶ 3, 4.)

Critically, Defendants are not merely *selling* (unlawfully) products in the previously licensed BAREFOOT CONTESSA frozen dinner package after their right to do so has expired; they also are *manufacturing* counterfeit BAREFOOT CONTESSA frozen dinners despite the clear prohibition on manufacturing in the Sell-Through Agreement.  Some of the products recently sold by a retailer in Florida bear sell-by dates in March and April 2016.  (*Id.*, Exs. A, C.)  Because BAREFOOT CONTESSA frozen dinners have a shelf-life of no more than eighteen months, (Binotto Decl., ¶ 9) and the last permissible date to manufacture BAREFOOT CONTESSA frozen dinners under the License was before May 1, 2014, it appears that those products were manufactured subsequent to termination of the License with absolutely no oversight by Barefoot Contessa.  Supporting that fact, on recently sold packages purporting to be BAREFOOT CONTESSA frozen dinners, the U.S. Department of Agriculture Food Safety Inspection Service ("FSIS") Establishment ID numbers originally printed into the package (which correspond to the Contessa Premium manufacturing facility where licensed product was produced) are concealed by adhesive strips, (Libath Decl., Exs. A, C) while a separate facility identification number — "32065" — is manually stamped elsewhere on the package.  (*Id.*)  The manually stamped identification numbers correspond to a seafood processing firm affiliated with Red Chamber.  (Klunder Decl., Exs. A, B.)

**Actual Confusion and Irreparable Harm**

As Defendants no doubt intended, their CONTESSA CHEF INSPIRED line and counterfeit BAREFOOT CONTESSA frozen dinners have caused actual confusion in the marketplace and threaten irreparable injury to Barefoot Contessa's brand.

For example, when asked whether its stores carry BAREFOOT CONTESSA frozen dinners, a Stop & Shop representative responded affirmatively, even though the store sells only CONTESSA CHEF INSPIRED products.  (Garten Decl., ¶ 31.)  Another retailer, on its

website, lists CONTESSA CHEF INSPIRED products with photographs of BAREFOOT CONTESSA frozen dinners, (*Id.* ¶ 33) and purchase receipts from the Stop & Shop denote CONTESSA CHEF INSPIRED product with the sales code for BAREFOOT CONTESSA ("BRFT CNT"). (*Id.*)

Consumers also are confused. In only a few weeks, Barefoot Contessa has received a number of customer complaints expressing disappointment over the suddenly poor quality of frozen dinners that they mistakenly believe to be BAREFOOT CONTESSA. Some of the complained-of meals, such as "chicken florentine," were never made under the License Agreement but are solely part of the CONTESSA CHEF INSPIRED line. (*Id.* ¶¶ 36–39.) Other complained-of meals that purportedly are part of the BAREFOOT CONTESSA line have expiration dates that suggest that they were manufactured *after* the termination of the License. (*Id.* ¶¶ 37, 38.)

The complaints also demonstrate the severe and irreparable harm that the BAREFOOT CONTESSA brand is suffering and — absent immediate intervention — will continue to suffer, as a result of Defendants' infringing activity. (*Id.* ¶ 41; Compl. ¶ 63.)

### Argument

To prevail on a motion for a preliminary injunction or a temporary restraining order, plaintiffs must show: (1) irreparable harm, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in plaintiff's favor. *Malletier* v. *Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quoting *Federal Express Corp.* v. *Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)).

Courts in this Circuit routinely grant preliminary injunctions and temporary restraining orders where, as here, defendants have infringed plaintiffs' distinctive trade dress and

11

trademark. *See, e.g.*, *Fun-Damental Too, Ltd.* v. *Gemmy Indus. Corp.*, 111 F.3d 993, 1007 (2d Cir. 1997) (preliminary injunction against coin bank design that infringed plaintiff's trade dress); *Tecnimed SRL* v. *Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 417–18 (S.D.N.Y. 2011) (preliminary injunction against thermometer packaging that infringed plaintiff's trade dress); *EnergyBrands Inc.* v. *Beverage Mktg. USA, Inc.*, No. 02 Civ. 3227 (JSR), 2002 WL 826814, at *3 (S.D.N.Y. May 1, 2002) (temporary restraining order against beverage label that infringed plaintiff's trade dress); *Tactica Int'l, Inc.* v. *Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 609–10 (S.D.N.Y. 2001) (preliminary injunction after temporary restraining order preventing beauty products manufacturer and distributor from infringing competitors' trademarked product names); *Ryan* v. *Volpone*, 107 F. Supp. 2d 369, 405 (S.D.N.Y. 2000) (preliminary injunction for former baseball player when memorabilia company continued using his trademark after license expired).

Barefoot Contessa easily satisfies the standards for a temporary restraining order and preliminary injunction here.

## I.

### BAREFOOT CONTESSA IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

#### A. DEFENDANTS' CONDUCT INFRINGES BAREFOOT CONTESSA'S TRADE DRESS AND TRADEMARK

To succeed on a Lanham Act trade dress or trademark infringement claim, plaintiff must demonstrate that (1) the trademark or trade dress is valid and entitled to protection, and (2) defendant's use of the trademark or trade dress is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services. *See Christian Louboutin S.A.* v. *Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 216–17 & n.9 (2d Cir. 2012). Barefoot Contessa easily satisfies this showing for both its trade dress and trademark infringement claims.

1.   **Barefoot Contessa's Trade Dress and**
     **Trademark Are Valid and Entitled to Protection**

To be protectable, trade dress either must be "inherently distinctive" or it must have "acquired distinctiveness through a secondary meaning." *Fun-Damental Too*, 111 F.3d at 999.

Trade dress is inherently distinctive when it "serves to identify [the] particular source of [the] product." *Id.* at 1000 (quoting *Two Pesos, Inc.* v. *Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  Distinctiveness is determined by considering the "total impression" made by the trade dress, rather than its individual elements. *Paddington Corp.* v. *Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993).  In the context of product packaging, "the choices that a producer has for packaging its products are . . . almost unlimited." *Tecnimed*, 763 F. Supp. 2d at 405 (quoting *Paddington*, 996 F.2d at 583) (alteration in original).  As a consequence, "typically a trade dress will be arbitrary or fanciful and thus inherently distinctive," *id.*, provided it is not "functional," or (as that term is defined) "essential to effective[ly] compet[ing] in a particular market." *Fun-Damental Too*, 111 F.3d at 1002; 15 U.S.C. § 1125(a)(3).  Here, the Frozen Dinner Trade Dress and the Food Product Trade Dress — the salient features of which include their Shaded Stripe Pattern and unique combination of other clearly non-functional elements — are arbitrary, fanciful, and thus inherently distinctive. *See e.g.*, *Bath & Body Works Brand Mgmt., Inc.* v. *Summit Entm't, LLC*, 7 F. Supp. 3d 385, 402 (S.D.N.Y. Mar. 21, 2014) (holding trade dress was inherently distinctive where "trade dress and packaging are adorned with a distinct design of relatively thin, barren trees — silhouetted against a contrasting background that is usually in hues of red, orange, pink, purple, brown or grey."); *Tecnimed*, 763 F. Supp. 2d at 404 (holding that a thermometer package was inherently distinctive where its "salient features . . . [were a] purple and blue color scheme; the phrase '5 in 1' [on the label]; the photograph of the

13

mother holding a sleeping baby; and the five small illustrations depicting a child, bottle, formula, nursery, and bathwater"); *Clinique Labs., Inc.* v. *Dep Corp.*, 945 F. Supp. 547, 559 (S.D.N.Y. 1996) (holding that makeup brand's trade dress was inherently distinctive based on the package's shape, graphics, shading, silver foil stamping of the letters, and "[t]he specific color scheme of pastels" recurring throughout the brand's products.").

The Frozen Dinner Trade Dress and the Food Product Trade Dress also have acquired secondary meaning.  In determining whether secondary meaning has been acquired, courts should consider: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." *Louboutin*, 696 F.3d at 226 (quoting *Genesee Brewing Co., Inc.* v. *Stroh Brewing Co.*, 124 F.3d 137, 143 n.4 (2d Cir. 1997)).  In connection with this analysis, "the most persuasive, if not conclusive, factor in favor of finding secondary meaning" is evidence of a deliberate attempt to copy the trademark or trade dress. *Tri-Star Pictures, Inc.* v. *Unger*, 14 F. Supp. 2d 339, 351 (S.D.N.Y. 1998); *Majestic Drug Co.* v. *Olla Beauty Supply, Inc.*, No. 97 Civ. 0046 (LAP), 1997 WL 37955, at *7 (S.D.N.Y. Jan. 31, 1997) ("[I]ntentional copying of . . . trade dress raises a presumption that the imitated trade dress has secondary meaning."); *Knorr-Nahrmittel A.G.* v. *Reese Finer Foods, Inc.*, 695 F. Supp. 787 (D.N.J. 1988).  Although Barefoot Contessa need not prove each factor to establish secondary meaning, *Tri-Star Pictures*, 14 F. Supp. 2d at 348, those factors are easily satisfied here. (*See supra*, 4–10.)

The BAREFOOT CONTESSA trademark, which Barefoot Contessa has used continuously since 1978, also is presumed to be distinctive and its two incontestable trademark registrations constitute conclusive proof that the mark is entitled to legal protection.  Federal

registration constitutes prima facie evidence of a mark's validity and ownership. 15 U.S.C. § 1115(a); *Lane Capital Mgmt, Inc.* v. *Lane Capital Mgmt, Inc.*, 192 F.3d 337, 345 (2d Cir. 1999); *Lois Sportswear, U.S.A., Inc.* v. *Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986). Incontestable trademark registrations serve as "conclusive evidence" of same.   15 U.S.C. § 1115(b).[2]

### 2.   Defendants' Use of the Trade Dress and Trademark Is Presumed, and Likely, to Cause Confusion

Here, likelihood of confusion is presumed as a matter of law because Contessa Premium is Barefoot Contessa's former licensee and because Defendants' copying is wholesale and intentional. *See, e.g.*, *L & L Wings, Inc.* v. *Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law."); *Ryan*, 107 F. Supp. 2d at 399 ("In the licensing framework, where the alleged unauthorized user of the trademark continues to use the identical, previously licensed trademark, after revocation of the license, likelihood of confusion is established."); *N.Y. State Soc'y of Cert. Pub. Accountants* v. *Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (where the trademark or trade dress infringement is the result of intentional copying, "likelihood of confusion will be presumed as a matter of law.").

Because likelihood of confusion exists as a matter of law, it is not necessary to analyze the likelihood of confusion factors set forth in *Polaroid Corp.* v. *Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961), which include:  (1) the strength of the mark; (2) the degree of similarity between the marks; (3) the proximity of the products; (4) the likelihood that the prior owner will bridge the gap; (5) actual confusion; (6) bad faith; (7) the quality of defendant's

---

[2]   Indeed, pursuant to the License, Contessa Premium explicitly acknowledged Barefoot Contessa's exclusive ownership of the BAREFOOT CONTESSA trademark, and further acknowledged the substantial goodwill that Barefoot Contessa has built in its trademark. (*See* Garten Decl., Ex. D (License), ¶ 11(a).)

product; and (8) the sophistication of buyers. *Id.* at 495. But, even if it were, the *Polaroid* factors also strongly support a finding of likelihood of confusion here.

**Barefoot Contessa's trade dress and trademark are indisputably strong and distinctive**. (*See supra* at 13–15); *see Paddington Corp.*, 996 F.2d at 585. They also have acquired strong secondary meaning in the marketplace, as a result of the tremendous retail success and the widespread and unsolicited press and media coverage that associated BAREFOOT CONTESSA products and services have enjoyed, (*see supra* at 13–14; Klunder Decl., Ex. C); *Stern's Miracle-Gro Prods., Inc. v. Shark Prods. Inc.*, 823 F. Supp. 1077, 1085 (S.D.N.Y. 1993), and as further evidenced by Defendants' deliberate copying of the trade dress and mark, (*see supra* at 9–10); *Tri-Star Pictures, Inc.*, 14 F. Supp. 2d at 351.

**Defendants are using a virtually identical trade dress and the exact same trademark.** Even though the License has now long expired, Defendants are continuing to manufacture and sell the same, but counterfeit, frozen dinners bearing the same Barefoot Contessa trade dress and BAREFOOT CONTESSA trademark. *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1999) (identical marks are "similar" as matter of law). In addition, Defendants are manufacturing and selling the same types of frozen dinners under the name CONTESSA CHEF INSPIRED in packaging that is virtually identical to the Frozen Dinner Product Trade Dress and with the CONTESSA mark. *See Energybrands, Inc.*, 2002 WL 826814, at *2 (trade dress is "very similar" where the only material difference between the trade dress is the appearance of defendants' brand name on defendants' product); *Rado Watch Co., Ltd. v. ABC Co.*, 92 Civ. 3657 (PKL), 1992 WL 142747, at *4 (S.D.N.Y. June 8, 1992) (granting injunction where it was "exceedingly difficult" to distinguish between the authentic and

infringing goods).   Indeed, it was in recognition of the substantial similarity of their respective marks that the parties here agreed not to use their marks in a confusing manner.

**The products were in the same market.** Defendants' frozen dinners compete in the same market in which Barefoot Contessa's frozen dinners were sold, and target the same consumers. *See Virgin Enter. Ltd.* v. *Nawab*, 335 F.3d 141, 150 (2d Cir. 2003) ("[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source.").   And where, as here, a former licensee uses the same trademark and trade dress in the same market, "likelihood of confusion is inevitable."   *Dunkin' Donuts Inc.* v. *N. Queens Bakery, Inc.*, 216 F. Supp. 2d 31, 40 (E.D.N.Y. 2001) (further noting that "[s]uch cases are open and shut").

**Defendants' bad faith is manifest.** Defendants' copying here could not have been more deliberate.   After having requested and been denied a new license to sell goods bearing the Barefoot Contessa trade dress and BAREFOOT CONTESSA trademark, Defendants simply helped themselves to Barefoot Contessa's intellectual property in order to sell the same products to the same consumers.   It is evident that Defendants intended the public to identify their products with Barefoot Contessa; indeed, they are manufacturing and selling *counterfeit* BAREFOOT CONTESSA dinners. *Church of Scientology Int'l* v. *Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) ("[T]he public interest is especially served by issuing a preliminary injunction against a former licensee … [because] the use of a mark by a former licensee confuses and defrauds the public."); *GTFM, Inc.* v. *Solid Clothing Inc.*, 215 F. Supp. 2d 273, 297 (S.D.N.Y. 2002) (where similarities "are so strong that they could only have occurred through deliberate copying[,] . . . a presumption arises that the copier has succeeded in causing confusion").

17

**There is evidence of actual confusion.**  Although plaintiff need not show actual confusion — particularly where, as here, the infringing products have been on the market only a short time, *Lois Sportswear*, 799 F.2d at 875 — there is already substantial evidence of actual confusion evidenced by consumers complaining to Barefoot Contessa about the quality of Defendants' goods. (*See supra*, 10–11.)  Such evidence of actual confusion "strongly supports a finding of likelihood of confusion." *Am. Ort, Inc.* v. *Israel*, No. 07 CV 2332 (KMK), 2007 WL 2049733, at *8 (S.D.N.Y. July 17, 2007) (holding that actual confusion factor weighed in favor of plaintiff when "at least one of Plaintiff's donors has already been confused by Defendant's use of the ORT mark.").

**Barefoot Contessa should not be held hostage to Defendants' lack of quality control.**  Under the quality of goods factor, "a court first examines whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Morningside Grp., Ltd.* v. *Morningside Cap. Grp., LLC*, 182 F.3d 133, 142 (2d Cir. 1999).  Here, there already is evidence that the quality of Defendants' frozen dinners falls far short of Barefoot Contessa's high standards. But even if the products were higher quality, that would not help Defendants, because "it is the control of quality that a trademark holder is entitled to maintain." *Polymer Tech. Corp.* v. *Mimran*, 975 F.2d 58, 62 (2d Cir. 1992). Thus, because Barefoot Contessa has no control over the quality of Defendants' infringing products, this factor further supports a finding of likelihood of confusion.  Moreover, even if Defendants' infringing products were of similar quality to authorized BAREFOOT CONTESSA goods, that similarity would only further reinforce the likelihood of confusion.  *See Morningside Grp., Ltd.*, 182 F.3d at 142 ("Products of equal quality may tend to create confusion as to source because of that very similarity of quality.").

**Consumers are likely to exercise a low degree of care**.  The products at issue in this case are inexpensive.  A typical CONTESSA CHEF INSPIRED frozen dinner costs $8.99.  (Garten Decl., Ex. H.)  As a result, consumers are less likely to exercise a great deal of care and more likely to be confused about the source of Defendants' infringing products.  *See Friesland Brands, B.V.* v. *Vietnam Nat. Milk Co.*, 228 F. Supp. 2d 399, 411 (S.D.N.Y. 2002) (purchasers of relatively inexpensive goods such as ordinary grocery store foods are held to "lesser standard of purchasing care"); *Krevat* v. *Burgers to Go, Inc.*, 12-CV-6258 (JS) (AKT), 2014 WL 4638844, *10 (E.D.N.Y. Sep. 16, 2014) ("Buyer sophistication is generally low where inexpensive products are involved." (quotation marks omitted)).

*     *     *

In sum, a balancing of the *Polaroid* factors makes clear that there is a strong likelihood of confusion in this case.  Thus, Barefoot Contessa is likely to succeed on the merits of its infringement claims.

## B.  DEFENDANTS' UNAUTHORIZED USE DILUTES THE VALUE OF BAREFOOT CONTESSA'S TRADE DRESS AND TRADEMARK

Defendants' brazen use of the BAREFOOT CONTESSA trademark, Food Product Trade Dress and Frozen Dinner Trade Dress also dilutes their value.[3]  The Barefoot Contessa trade dress and BAREFOOT CONTESSA trademark are famous and have been in widespread commercial use before the CONTESSA CHEF INSPIRED line was launched.  (*See supra* 4–5, 9–10.)  With its virtually identical trade dress, its unauthorized use of the BAREFOOT CONTESSA trademark, and its apparent poor quality according to consumers of the products, Defendants' product line both blurs and tarnishes the exclusive association that

---

[3]   To prove dilution, plaintiff must show that:  "(1) the senior mark is famous; (2) the defendant is making use of the junior mark in commerce; (3) defendant's use of the junior mark began after the senior mark became

consumers have with products and services of Barefoot Contessa, thus diluting the BAREFOOT CONTESSA trademark, Food Product Trade Dress and Frozen Dinner Trade Dress.[4] *See N.Y. City Triathlon*, 704 F. Supp. 2d at 322 ("Blurring occurs when there is a possibility that the mark will lose its ability to serve as a unique identified of an owner's product."); *Perkins School for the Blind* v. *Maxi-Aids, Inc.*, 274 F. Supp. 2d 319, 326 (E.D.N.Y. 2003) ("The sine qua non of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use.").[5]

---

famous; and (4) a likelihood of dilution." *N.Y. City Triathlon* v. *NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 321 (S.D.N.Y. 2010).

[4]   The Lanham Act provides a non-exhaustive list of factors to be considered in determining whether use of a mark is likely to cause dilution by blurring, including: "(i) [t]he degree of similarity between the mark or trade name and the famous mark[;] (ii) [t]he degree of inherent or acquired distinctiveness of the mark[;] (iii) [t]he extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark[;] (iv) [t]he degree of recognition of the famous mark[;] (v) [w]hether the user of the mark or trade name intended to create an association with the famous mark[;] and (vi) [a]ny actual association between the mark or trade name and the famous mark." 15 U.S.C. § 1125(c)(2)(B). For New York state law blurring, the mark's fame need not be shown, but it must also be shown that the mark is distinctive and that the marks are substantially similar. *Starbucks Corp.* v. *Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 114 (2d Cir. 2009). To establish dilution by tarnishment under the Lanham Act, a plaintiff must show the likelihood of "an association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2)(C). New York's tarnishment doctrine does not require a famous mark, but instead is shown when a distinctive mark is "linked to products of shoddy quality . . . with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." *N.Y. Stock Exch., Inc.* v. *N.Y., N.Y. Hotel, LLC*, 293 F.3d 550, 558 (2d Cir. 2002); *see also* N.Y. Gen. Bus. Law 360-*l* (New York dilution statute).

[5]   Because the facts giving rise to a claim for unfair competition under the Lanham Act are the same as a claim for trademark infringement, on which Barefoot Contessa has demonstrated the likelihood of success, (*see supra* Part I.A) Barefoot Contessa is likely to prevail on its claim for unfair competition as well. *Twentieth Century Fox Film Corp.* v. *Marvel Enters., Inc.*, 220 F. Supp. 2d 289, 297 (S.D.N.Y. 2002) ("[I]t is well settled that the standards for false designation of origin claims under Section 43(a) of the Lanham Act (15 U.S.C. § 1125) are the same as for trademark infringement claims under Section 32."). In addition, because the elements required to prevail on claims for trademark infringement, unfair competition, and trademark dilution under New York law mirror the same claims under the Lanham Act, on which Barefoot Contessa is likely to succeed (*see supra* Part I.A.–I.B.), Barefoot Contessa also is likely to succeed on its claims under New York law. *See U.S. Polo Ass'n* v. *PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 538 (S.D.N.Y. 2011), *aff'd*, 511 Fed. App'x 81 (2d Cir. 2013); *Oleg Cassini, Inc.* v. *Weber's 32nd St. Corp.*, No. 07 Civ. 6301, 2008 WL 2780988, at *2 n.4 (S.D.N.Y. July 15, 2008) ("New York's anti-dilution statute, General Business Law section 360-*l*, is analyzed in the same manner as claims arising under the Federal Trademark Dilution Act."); *see also Louis Vuitton Malletier* v. *Dooney & Bourke, Inc.*, 454 F.3d 108, 119 (2d Cir. 2006) (lower court erred in denying preliminary injunction on state law trademark infringement and unfair competition claims for same reasons stated in discussion of federal claims).

**C.    DEFENDANTS BREACHED THE SETTLEMENT AGREEMENT, LICENSE AND SELL-THROUGH AGREEMENT**

Defendants' unauthorized use of Barefoot Contessa's trade dress and trademarks also breaches Defendants' obligations under the Settlement Agreement, the License and the Sell-Through Agreement.

The Settlement Agreement explicitly requires Contessa Premium — along with the other Defendants as its successors and assigns — to "make all efforts to avoid confusion between the brands," and committed them not to use any design element in combination with the word "Contessa" that would be likely to create consumer confusion between Contessa Premium and Chef Garten.  (Garten Decl., Ex. C (Settlement Agreement) ¶¶ 3(e), 8.)  By creating manifest confusion as to the source, sponsorship, or endorsement of Defendants' frozen food products, (*see supra* 10–11), Defendants' unauthorized use of Barefoot Contessa's trade dress and trademark is a clear breach of the Settlement Agreement.

Defendants' use of the Barefoot Contessa trade dress and BAREFOOT CONTESSA trademark also is a flagrant violation of OFI's obligations under the Sell-Through Agreement.  Notwithstanding the clear and unambiguous requirements to stop doing so, Defendants are continuing to manufacture, distribute and sell frozen food products using the previously licensed packaging — which bears Barefoot Contessa's trademark, trade dress and other intellectual property — long after they had any right to do so, in direct violation of the Sell-Through Agreement.

Defendants' conduct likewise is in breach of the License Agreement, which obligates Contessa Premium to stop manufacturing BAREFOOT CONTESSA products and to stop using licensed Barefoot Contessa intellectual property upon termination of the License, and to stop selling Sell-Through Items 180 days after termination. (Garten Decl., Ex. D (License) ¶

21

7(b).)   Defendants' continued manufacture and marketing of products bearing the Barefoot Contessa trade dress and BAREFOOT CONTESSA mark is a breach of Contessa Premium's obligations under the License.   *See Murjani Int'l, Ltd.* v. *Sun Apparel, Inc.*, No. 87 CIV. 4628 (PKL), 1987 WL 15110, *10 (S.D.N.Y. July 31, 1987) ("The continued use by the defendants of a licensed trademark after the licensing agreement had been terminated constitutes an additional trademark infringement as well as a breach of contract.").

## II.

## BAREFOOT CONTESSA WILL SUFFER IRREPARABLE HARM IF DEFENDANTS ARE NOT IMMEDIATELY RESTRAINED

Where, as here, plaintiff in a trademark infringement case demonstrates a likelihood of confusion or a likelihood of dilution (*see supra* Part I), irreparable harm is presumed. *Hasbro, Inc.* v. *Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir. 1988) ("In a Lanham Act case, a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm."); *see also Weight Watchers Int'l* v. *Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) (same); *Burlington Coat Factory*, 426 F.3d at 537 (same); *Deere & Co.* v. *MTD Prods., Inc.*, 860 F. Supp. 113, 122 (S.D.N.Y. 1994), *aff'd*, 41 F.3d 39 (2d Cir. 1994) (existence of irreparable injury cannot be denied where there is likelihood of dilution).   Accordingly, this Court should enjoin Defendants from further use of the Barefoot Contessa trade dress and the BAREFOOT CONTESSA trademark.[6]

---

[6]   The Second Circuit has yet to decisively resolve the question of whether the Supreme Court's patent holding in *eBay Inc.* v. *MercExchange, LLC*, 547 U.S. 388 (2006) invalidates a presumption of irreparable harm with regard to trademark-related claims. *U.S. Polo Ass'n, Inc.* v. *PRL USA Holdings, Inc.*, 511 Fed. App'x 81, 85 (2d Cir. 2013) ("We need not here decide whether a presumption of irreparable harm from trademark infringement can apply in light of [*eBay* and *Salinger* v. *Colting*, 607 F.3d 68 (2d Cir. 2010)] . . ."). Absent a decisive resolution of this issue, some courts have continued to apply the presumption. *See, e.g., Coach, Inc.* v. *O'Brien*, No. 10 Civ. 6071 (JPO)(JLC), 2012 WL 1255276, at *17 (S.D.N.Y. April 13, 2012) ("The first *eBay* factor, irreparable harm, is automatically satisfied by actual success on the merits, as irreparable harm is established by a showing of likelihood of confusion" (quotation marks omitted)).   Although Barefoot Contessa submits that the presumption should apply in this case, even without the presumption there is clear evidence of irreparable harm.

In the absence of an injunction, the potential harm to Barefoot Contessa's reputation and business is immeasurable. Barefoot Contessa will suffer severe damage to the core of its business, including potentially the loss of consumers. (Garten Decl., ¶¶ 3, 9.) Barefoot Contessa does not lightly make the decision to license — and authorize others to display — its trademark and trade dress on products; rather, such endorsement is provided only after Barefoot Contessa has determined to its satisfaction that the product is of high quality, comports with the standards of Barefoot Contessa's own goods and services, and is reflective of the quality and goodwill associated with Barefoot Contessa and its brand. (*Id.* ¶¶ 4, 5.) Barefoot Contessa has built a highly successful brand by establishing consumer trust, which is at risk of being undermined by Defendants' unauthorized uses of Barefoot Contessa's trademark and trade dress, as evidenced by the actual consumer confusion and quality complaints that have already come to Barefoot Contessa's attention. *See N.Y. City Triathlon,* 704 F. Supp. 2d at 325 (finding irreparable harm because "Defendant [was] not only trading on Plaintiff's earned goodwill, but also [was] taking from Plaintiff the ability to control its reputation and the services offered under its name and mark."). As courts in this Circuit routinely recognize, it is of paramount importance for a trade dress and trademark owner to be able to control its brand — and, by extension, the brand's reputation — through rigorous enforcement of its trademark rights. *See Power Test Petroleum Distribs.* v. *Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) (holding that irreparable harm may be found when trademark owner demonstrates that "it will lose control over the reputation of its trademark pending trial").

Moreover, Defendants' unauthorized use of the Barefoot Contessa trade dress and BAREFOOT CONTESSA trademark damages Barefoot Contessa's relationship with its exclusive licensees and business partners, makes it more difficult for Barefoot Contessa to grant

use of its mark and trade dress to potential licensees, and damages the value of the licenses and endorsements that Barefoot Contessa offers. If unauthorized third parties are able to obtain the benefits of using Barefoot Contessa's valuable and recognizable trade dress and trademark without the expense of a license from Barefoot Contessa, then third parties that might otherwise be interested in entering into such agreements with Barefoot Contessa may be discouraged from doing so, resulting in loss of revenue and market share for the BAREFOOT CONTESSA brand and diminishment of the brand in the eyes of consumers.

The need for immediate relief is particularly urgent where, as here, Defendants' products are food products and Defendants' conduct impairs consumers' ability to make informed decisions about source of the products they consume. Consumers look to the BAREFOOT CONTESSA brand as a guarantee that the food they eat is sourced and produced according to the highest health and safety standards and Barefoot Contessa cannot ensure the compliance of Defendants' infringing products with those standards. Accordingly, a preliminary injunction will also serve the public interest. *See Tecnimed SRL*, 763 F. Supp. 2d at 417 (public interest was served "by removing confusing trade dress from the marketplace").

## III.

## BAREFOOT CONTESSA HAS RAISED SERIOUS QUESTIONS ON THE MERITS AND THE BALANCE OF HARDSHIPS TIPS IN ITS FAVOR

A court may issue a temporary restraining order or a preliminary injunction not only when the moving party has established a likelihood of success on the merits, but also where there are "sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly [in the movant's favor]." *Burlington Coat Factory*, 426 F.3d at 537 (quoting *Fed. Express*, 201 F.3d at 173). Barefoot Contessa has clearly met this alternative standard because the balance of hardships here tips overwhelmingly

in Barefoot Contessa's favor, and as discussed above, Barefoot Contessa — at the least — has raised serious questions on the merits of its claims raising a fair ground for litigation.

Here, the harm to Barefoot Contessa in the absence of an injunction far outweighs any potential harm to Defendants.  As noted above, if Defendants are allowed to continue their confusing and unauthorized use of Barefoot Contessa's trade dress and trademark, Barefoot Contessa would suffer not only monetary loss but also tarnishment of its reputation and loss of consumer trust and goodwill.  (*See supra* Part II.)  By contrast, if an injunction is entered, Defendants will, at most, suffer quantifiable money damages associated with loss of inventory, lost sales, and the redesign of their infringing packaging.  And any such harm Defendants may suffer is entirely of their own doing because Defendants deliberately manufactured and shipped frozen food products bearing the infringing trademark and trade dress with the knowledge that they had no authorization to do so.  When the moving party will suffer uncompensable harm in the absence of an injunction and the defendant is harmed only economically, courts in this Circuit routinely find that the balance of hardships tips decidedly in movant's favor.  *See Warner-Lambert Co.* v. *Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996); *see also Markovits* v. *Venture Info. Capital, Inc.*, 129 F. Supp. 2d 647, 661 (S.D.N.Y. 2001) (award of damages would not compensate moving party where threat of harm was to party's viability in marketplace).

## Conclusion

For the reasons set forth above and in the accompanying declarations, Barefoot Contessa respectfully requests that the Court grant its motion for a temporary restraining order and preliminary injunction.

Dated:  February 19, 2015
        New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:_____

     Lynn B. Bayard (lbayard@paulweiss.com)
     Aidan Synnott (asynnott@paulweiss.com)
     Darren W. Johnson (djohnson@paulweiss.com)
     Rachale C. Miller (ramiller@paulweiss.com)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiffs Barefoot Contessa Pantry, LLC, Ina Garten and Ina Garten, LLC*

26

# Appendix

**Appendix to Memorandum of Law in Support of Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction**

| | Barefoot Contessa Frozen Dinner Trade Dress | CONTESSA CHEF INSPIRED Packaging |
|---|---|---|
| **Front Panel** | (a) Shaded Stripe Pattern in lighter and darker shades of red on the top third of the packaging | (a) Same |
| | (b) Colored banner beneath the Shaded Stripe Pattern with the recipe name in all-white text and all-lower case letters | (b) Same |
| | (c) Photograph of the prepared dinner on the lower portion of panel with a description of the dinner in black text | (c) Same |
| | (d) "barefoot contessa" printed on the Shaded Stripe Pattern in white text | (d) "Contessa" printed on the Shaded Stripe Pattern in white text |
| | (e) Photograph of Chef Garten | (e) Photograph of a brunette woman in the place of Chef Garten |
| | (f) The word "Ina" in white cursive font resembling handwriting on the Shaded Stripe Pattern | (f) The words "Chef Inspired" in white cursive font resembling handwriting on the Shaded Stripe Pattern |
| **Side Panels** | (a) Right side features the Shaded Stripe Pattern, colored banner, recipe name and photograph of the dinner carried over from front panel | (a) Same |
| | (b) Left side features the nutritional panel and the Shaded Stripe Pattern | (b) Same |
| **Rear Panel** | (a) White box over the Shaded Stripe Pattern divided in half by a horizontal red line | (a) Same |
| | (b) Cooking instructions and a photograph of the dinner being prepared in a sauté pan in the lower half of the white box | (b) Same |
| | (c) A colored banner with the product name in white lower case text in the top left hand corner of the white box | (c) Same |
| | (d) The brand name in the top of right of the box in red lettering | (d) Same |
| | (e) A photograph of fresh ingredients in the top right side of the white box | (e) Same |
| | (f) The phrase "Nothing tastes better than a freshly cooked dinner made with great ingredients." in red text. | (f) Same |
| | (g) "Even Better:" in red text followed by a tip for preparing the meal in black text in the top left of the white box | (g) "Even Better:" in red text followed by a tip for preparing the meal in black text in the top left of the white box using similar or identical language |
| | (h) A quote from Chef Garten concerning the nature of the dish with a dash the word "Ina" written below in a red font resembling handwriting in the top left of the white box | (h) Similar or identical language concerning the nature of the dish with a dash the word "Enjoy" written below in a red font resembling handwriting in the top left of the white box |