UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 02/26/2015
```

----------------------------------------------------------------------X
                         :

BAREFOOT CONTESSA PANTRY, LLC, et al.,   :

                    Plaintiffs,       :          15-CV-1092 (JMF)

                         :

          -v-                 :        OPINION AND ORDER

                         :

AQUA STAR (USA) CO., et al.,           :

                         :

                 Defendants.    :

                         :

----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       Plaintiffs in this case — Barefoot Contessa Pantry, LLC, Ina Garten, and Ina Garten, LLC (together, "Plaintiffs" or "Barefoot Contessa") — are well known in the world of food and cooking for, among other things, an Emmy-winning TV show on the Food Network, several bestselling cookbooks, and several lines of high-end food products.  On February 17, 2015, they filed a complaint and a motion for a temporary restraining order and preliminary injunction against Defendants Aqua Star (USA) Co. ("Aqua Star"), O.F.I. Imports, Inc. ("OFI") (now doing business as Contessa Premium Foods), Red Chamber Co. ("Red Chamber"), and Contessa Premium Foods, Inc. ("Contessa Premium") (together, "Defendants"), alleging, *inter alia*, trademark and trade dress infringement under the Lanham Act.  (Docket Nos. 1, 6).  Plaintiffs seek injunctive relief primarily based on Defendants' sale of frozen dinners — labeled "Contessa Chef Inspired" — with packaging almost identical to the packaging of frozen dinners that had been sold under the name "Barefoot Contessa" pursuant to a licensing agreement between Barefoot Contessa and Defendants' predecessor-in-interest, Contessa Premium (the "Frozen Dinner Trade Dress").  Plaintiffs also allege that Defendants have breached an agreement and

violated the Lanham Act by continuing to sell or allow to be sold frozen entrees under the "Barefoot Contessa" name.  Defendants filed their opposition to Plaintiffs' motion on February 23, 2015, and the Court held oral argument on February 24, 2015.

At a hearing held yesterday — February 25, 2015 — the Court granted Plaintiffs' motion for a temporary restraining order, for reasons to be stated in a written opinion to follow, and scheduled a preliminary injunction hearing for March 11, 2015.  This is the written opinion.

## BACKGROUND

In assessing Plaintiffs' motion for a temporary restraining order, the Court has reviewed all submissions by the parties, including their initial memoranda, accompanying declarations, and supplemental memoranda submitted after the initial hearing on February 24, 2015.  The Court has also considered the oral arguments of counsel at the hearings held on February 24 and 25, 2015.  For present purposes, the facts relevant to this case can be summarized briefly, and — like the legal conclusions following them — are without prejudice to any subsequent findings made after a full preliminary injunction hearing.  *See Energybrands, Inc. v. Beverage Mktg. USA, Inc.,* No. 02-CV-3227 (JSR), 2002 WL 826814, at *1 (S.D.N.Y. May 1, 2002).

In 2008, after litigation before the United States Patent and Trademark Office between Barefoot Contessa and Contessa Premium, a former food producer that owned the Contessa trademark in connection with certain frozen foods (Decl. Carolyn C. Mattus Supp. Defs.' Opp'n Pls.' Mot. TRO & Prelim. Inj. (Docket No. 18) ("Mattus Decl."), Ex. D, ¶ 8; *see id.*, Exs. B-F, I), the two parties entered into a settlement agreement.  (Decl. Ina Garten Supp. Pls.' Mot. TRO & Prelim. Inj. (Docket No. 9) ("Garten Decl."), Ex. C (the "Settlement Agreement").  Pursuant to that agreement, Barefoot Contessa agreed not to register or use its Barefoot Contessa trademarks in connection with frozen meals or frozen seafood, and Contessa Premium agreed to refrain from

engaging in certain activities that could create confusion between the two brands, including using its trademarks in connection with cookbooks and "us[ing] or register[ing] any word or design element in combination with CONTESSA that would be likely to create consumer confusion between Contessa Premium and Garten."  (Settlement Agreement §§ 2(c); *id.*, 3(c), (e)). Contessa Premium and Barefoot Contessa then decided to conduct business together. Specifically, the companies entered into a licensing agreement (the "Licensing Agreement"), pursuant to which Barefoot Contessa granted Contessa Premium a license to use certain of its intellectual property in connection with a line of frozen dinners to be manufactured and marketed by Contessa Premium.  (Garten Decl., Ex. D).  The two entities then developed a line of Barefoot Contessa frozen dinners bearing Ina Garten's likeness, the Barefoot Contessa logo, and the Frozen Dinner Trade Dress.  (Garten Decl., Ex. E).

On or about April 30, 2014, as a result of financial difficulties, Contessa Premium assigned its assets to OFI through its affiliate Aqua Star.  (Garten Decl. ¶ 27).  The next day, Barefoot Contessa cancelled its license with Contessa Premium; OFI then approached Garten to discuss signing a new licensing agreement, but Garten declined, allegedly out of concern that OFI lacked experience manufacturing frozen dinners.  (Garten Decl. ¶¶ 27-28; *see also* Decl. Charles Handford Supp. Defs.' Opp'n Pls.' Mot. TRO & Prelim. Inj. (Docket No. 19) ¶ 9).  On May 23, 2014, however, OFI and Barefoot Contessa entered into a Sell-Through Agreement, pursuant to which OFI was allowed to sell existing Barefoot Contessa frozen dinners that had been manufactured prior to the termination of the Licensing Agreement, but was required to destroy any Barefoot Contessa frozen dinners remaining after October 28, 2014.  (Garten Decl. ¶ 29; *id.*, Ex. F).  Barefoot Contessa filed this lawsuit and motion shortly after Garten saw Barefoot Contessa frozen dinners on the shelves of local supermarkets, often alongside

3

"Contessa Chef Inspired" frozen dinners bearing virtually identical packaging to the Barefoot Contessa dinners.  (Garten Decl. ¶¶ 30-32; *see* Supplemental Decl. Ina Garten Supp. Pls.' Mot. TRO & Prelim. Inj. (Docket No. 24) ("Garten Supplemental Decl."), Ex. A).

## DISCUSSION

In order to prevail on a claim for temporary injunctive relief, "a plaintiff must establish: (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in its favor." *Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (internal quotation marks omitted).  The Second Circuit has not definitively ruled on whether a Court should consider the additional factors set forth in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 393 (2006), and *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008), in evaluating preliminary injunctions in the trademark infringement context.  *See Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010) (holding that a court must consider the balance of hardships and the public interest in granting preliminary injunctive relief, but cabining its holding to copyright cases); *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 518 (S.D.N.Y. 2013) (discussing the uncertainty); *see also New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (applying the four-factor *Winter* test to the denial of a preliminary injunction in a First Amendment case).  Nevertheless, as the Second Circuit has noted, "*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context," *Salinger*, 607 F.3d at 78, and some district courts have applied the additional two factors in the trademark and trade dress infringement context as well.  *See, e.g.*, *VOX Amplification Ltd. v. Meussdorffer*, — F. Supp. 3d —, No. 13-

CV-4922 (ADS) (GRB), 2014 WL 4829578, at *12 (E.D.N.Y. Sept. 29, 2014); *Kind LLC v. Clif Bar & Co.*, No. 14-CV-770 (KMW) (RLE), 2014 WL 2619817, at *1 (S.D.N.Y. June 12, 2014). Accordingly, the Court will also consider whether the balance of hardships tips in Plaintiffs' favor and whether a temporary restraining order is in the public interest.

## A.  Likelihood of Success on the Merits

Beginning with the merits factor, the Court finds — based on the record currently before it — that Plaintiffs have established a likelihood of success on the merits of their Lanham Act claim for trade dress infringement.  In order to establish a valid Lanham Act claim based on trademark or trade dress infringement, a party must show, first, that the trademark or trade dress is valid and entitled to protection, and second, that defendant's use of the trademark or trade dress is likely to cause consumer confusion as to the origin, affiliation or association, or endorsement of defendant's goods or services.  *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings*, 696 F.3d 206, 216-17 & n.9 (2d Cir. 2012).  In this case, the principal dispute between the parties is over who owns the Frozen Dinner Trade Dress.

When a dispute over trade dress or trademark ownership arises between manufacturers and distributors, courts typically "look first to any agreement between the parties regarding trademark rights."  *Excell Consumer Prods. Ltd. v. Smart Candle LLC*, No. 11-CV-7220 (MEA), 2013 WL 4828581, at *22 (S.D.N.Y. Sept. 10, 2013) (internal quotation marks omitted), *opinion supplemented on denial of reconsideration*, 2014 WL 1796657 (S.D.N.Y. May 5, 2014).  In this case, however, the Licensing Agreement between Plaintiffs and Contessa Premium does not answer the question of ownership of the Frozen Dinner Trade Dress.  To be sure, Defendants are correct that the licensing agreement "neither claimed nor licensed any other intellectual property" besides certain Barefoot Contessa and Ina Garten marks.  (Defs.' Opp'n Pls.' Mot.

5

TRO & Prelim. Inj. (Docket No. 17) ("Defs.' Mem.") 5, 12-13.  But nor does the Agreement contain any language purporting to establish it as the exclusive agreement regarding the division of intellectual property between Barefoot Contessa and Contessa Premium, let alone the exclusive agreement regarding Plaintiffs' ownership or non-ownership of intellectual property not mentioned in the Agreement.  Accordingly, its silence on ownership of the Frozen Dinner Trade Dress — trade dress that was developed after the agreement was signed (*see* Decl. Jennifer Albert Supp. Defs.' Opp'n Pls.' Mot. TRO & Prelim. Inj. (Docket No. 21) ("Albert Decl.") ¶¶ 4-7) — does not defeat Plaintiffs' claim of ownership.

Where disputes as to trademark or trade dress ownership arise between manufacturers and exclusive distributors and no agreement controls, courts often apply four factors to determine superior ownership: "(1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints."  *Tactica Int'l, Inc. v. Atl. Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001); *see also Sengoku Works Ltd. V. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996).  In addition to those four factors, "a court may look at which party possesses the goodwill associated with the product, or which party the public believes stands behind the product." *Tactica*, 154 F. Supp. 2d at 600 (internal quotation marks omitted). Neither party disputes that the factors are appropriate here insofar as they implicate considerations relevant to any trade dress dispute between business partners, regardless of their formal relationship.[1]

---

[1]      This line of cases also applies a presumption of ownership in favor of the manufacturer vis-à-vis the distributor, on the theory that the manufacturer, as the creator of the goods, is more likely to have created any trademarks with which they are associated.  *See Sengoku*, 96 F.3d at

The first factor — which party invented and first affixed the Frozen Dinner Trade Dress on the products at issue — is the most hotly contested element in this case.[2]  Nevertheless, there is ample evidence here to support Plaintiffs' assertion that it was, in fact, they who invented the trade dress at issue, including factors like those the Second Circuit found salient in affirming the district court's finding that the plaintiff invented the trade dress at issue in *Technimed*.  *See* 462 F. App'x at 33.  Here, as in *Technimed*, the parties may have "worked together to create the trade dress," and Defendants may have "devised the final package design," *see id.*, but "that design was based on key elements first conceived by" Plaintiffs, *id.*, a fact that is clear from a comparison of the striped design and white lettering used in Plaintiffs' previous food products and the similar design used in the Frozen Dinner Trade Dress.  (*Compare* Garten Decl., Ex. B, *with id.*, Ex. E).  *Technimed*, 462 F. App'x at 33.  Indeed, the ex-CEO of Contessa Premium himself confirms that it "obtained from Barefoot Contessa a distinctive package design that consumers would associate solely with Barefoot Contessa," in order to avoid confusion with Contessa Premium's regular offerings.  (Decl. Donald J. Binotto Supp. Pls.' Mot. TRO & Prelim. Inj. (Docket No. 10) ¶¶ 3-4).

---

1220-21.  Since "[t]he determinative issue is not which label is placed upon the relationship, but rather which party can establish priority of ownership," *id*. at 1220, and, at best, Contessa Premium appears to stand on equal footing with respect to Barefoot Contessa in creating the trade dress at issue, the Court will not apply such a presumption here.

[2]      Strictly speaking, the issue of which party "affixed" the trade dress onto the frozen food products — likely Contessa Premium, as the manufacturer and distributor of the products — has little bearing on ownership, as Contessa Premium did so pursuant to the Licensing Agreement, and hence was doing so for the benefit of Plaintiffs.  *See Tecnimed SRL v. Kidz-Med, Inc.*, 462 F. App'x 31, 33 (2d Cir. 2012) (summary order) ("In short, because Kidz-Med affixed the trade dress at the instruction, and for the benefit, of Tecnimed, the district court did not clearly err in according this action little weight in determining ownership.").  Accordingly, the Court focuses on the question of which party "invented" the Frozen Dinner Trade Dress.

In any event, the Court need not definitively resolve which way the first factor cuts at this early stage of the litigation, because — based on the current record — the remaining factors favor Plaintiffs.  Most notably, although neither party has submitted evidence as to who handled consumer complaints, the evidence strongly suggests that consumers identified the Frozen Dinner Trade Dress with Plaintiffs, not with Contessa Premium.  (*See* Garten Decl. ¶¶ 37, 39 (noting that Barefoot Contessa has received numerous complaints as to the quality of either Barefoot Contessa or Contessa Chefs Inspired meals)).[3]   Additionally, that Ina Garten is a best-selling author of nine cookbooks and the host of a long-running Food Network show — and has over 750,000 followers on Facebook (Garten Decl. ¶¶ 11-13) — suggests that she, not Contessa Premium, possessed the goodwill associated with the frozen meals and associated Frozen Dinner Trade Dress.  *See Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 854 (3d Cir. 1986) (noting that trademark ownership can be established by, among other things, proof that a party gives to the product "'the benefit of his reputation, or of his name and business style. The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it." (quoting Callmann, Unfair Competition, Trademarks and Monopolies § 17.16 (4th ed., 1981)).[4]

---

[3]     That conclusion may be further supported by the information on the Barefoot Contessa frozen dinner packaging.  The side panel instructs customers with any issues regarding quality to either write to an address in Commerce, California, or to visit barefoot.contessa.com.  (Garten Supplemental Decl., Ex. C).  Neither party has submitted evidence indicating who handled consumer complaints sent to the Commerce, California, address — and it may well have been Contessa Premium — but consumers were, at the very least, simultaneously directed to Barefoot Contessa's website, if not exclusively directed to Barefoot Contessa.

[4]     Although not argued in their memoranda, Defendants asserted at the February 24th hearing that text on the side of the Barefoot Contessa frozen dinners — "design, trademarks, and all copy © Contessa Premium Foods, Inc. 2012, 2013" — should be considered in weighing ownership of the Frozen Dinner Trade Dress.  (*See* Albert Decl. ¶ 10; *id*, Ex. A & B).  Based on the current record, however, the Court declines to afford this fact any weight, as (1) that text, if taken literally, would suggest that Defendants own the Barefoot Contessa trademarks used in the

Having established a likelihood of prevailing on the preliminary question of ownership, Plaintiffs must also show that the Frozen Dinner Trade Dress is valid and worthy of protection. Here too, Plaintiffs have the better argument.  In particular, the Court finds that Plaintiffs have established a likelihood of prevailing in their argument that the Frozen Dinner Trade Dress is "inherently distinctive."  *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 583 (2d Cir. 1993) ("Since the choices that a producer has for packaging its products are . . . almost unlimited, typically a trade dress will be arbitrary or fanciful and thus inherently distinctive, and the only real question for the courts will be whether there is a likelihood of confusion between the products.").  The fact that the Frozen Dinner Trade Dress incorporates "common elements," such as vertical red stripes found in other food packaging, "does not demonstrate that the trade dress as a whole is generic," because "[e]ven where each of these elements individually would not be inherently distinctive, it is the combination of elements and the total impression that the dress gives to the observer that should be the focus of a court's analysis of distinctiveness." *Tecnimed SRL v. Kidz-Med, Inc.*, 763 F. Supp. 2d 395, 405 (S.D.N.Y. 2011) (internal quotation marks omitted), *aff'd*, 462 F. App'x 31.  Instead, the Court finds that Plaintiffs have adequately established that the "total impression" created by the Frozen Dinner Trade Dress, in its selection of different design elements, colors, and shading, is arbitrary and fanciful, and hence inherently distinctive.  *See Clinique Labs., Inc. v. Dep Corp.*, 945 F. Supp. 547, 559 (S.D.N.Y. 1996) ("The arrangement of the graphics on the products and packaging, as well as the textured shading of the

---

Frozen Dinner Trade Dress, which would be absurd given the Licensing Agreement and general trademark principles; and (2) there is no evidence that Contessa Premium actually registered any copyrights associated with the Barefoot Contessa frozen dinners.

packaging, all comprise a distinctive arrangement of features that make Clinique's trade dress arbitrary and fanciful.").

Finally, the Court finds that Plaintiffs have established a likelihood of consumer confusion. Many courts in this Circuit have held that "[w]hen an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law." *L & L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009); *see also Southland Corp. v. Froelich*, 41 F. Supp. 2d 227, 243 (E.D.N.Y. 1999) (collecting cases). Defendants do not dispute that they should be treated as ex-licensees insofar as they "stand in the shoes" of Contessa Premium. Instead, they contend that the presumption does not apply because the trade dress at issue, as discussed earlier, was not explicitly licensed to Contessa Premium, and "[t]he key question is whether the former licensee continued to use the marks that were licensed after the license was terminated." (Defs.' Supplemental Ltr. Br. (Docket No. 26) 2). It is true that many courts employing the presumption apply it to "previously licensed" trademarks. *See, e.g.*, *Southland Corp*, 41 F. Supp. 2d at 243. Nevertheless, the Court sees no reason to limit the doctrine in that way, as the presumption is ultimately based on the effect of a former licensing agreement on the minds of consumers rather than the specific nature of the business agreement between the parties. That is, in cases involving ex-licensees, such as this one, "confusion is almost inevitable because consumers have already associated the formerly licensed infringer with the trademark owner." *L & L Wings*, 676 F. Supp. 2d at 188; *see also Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 44 (2d Cir. 1986) (stating that, in trademark infringement cases involving ex-licensees, "[c]onsumers have already associated some significant source identification with the licensor. In this way the use of a mark by a former licensee confuses and defrauds the public.").

In any event, whether or not the presumption applies, Plaintiffs have made a sufficient showing of consumer confusion arising from Defendants' use of the Frozen Dinner Trade Dress in its "Contessa Chef Inspired" product line.  In evaluating whether a party has established consumer confusion, courts in this Circuit consider eight factors originally set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961): "(1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (internal quotation marks omitted).  The Second Circuit has further clarified that "[t]he application of the *Polaroid* test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused."  *Id*. (internal quotation marks omitted).

Considering the *Polaroid* factors here, the Court finds that Plaintiffs have established a likelihood of succeeding on the issue of consumer confusion, given — among other things — the striking similarities between the packaging of the Barefoot Contessa and "Contessa Chef Inspired" frozen meals (*see* Garten Supplemental Decl., Ex. A); the relative lack of sophistication of consumers purchasing ordinary grocery store items, *see Friesland Brands, B. V. v. Vietnam Nat. Milk Co.*, 228 F. Supp. 2d 399, 411 (S.D.N.Y. 2002); and the evidence of actual consumer confusion submitted by Plaintiffs.  (Pls.' Mem. Law Supp. Mot. TRO & Prelim. Inj.

(Docket No. 7) ("Pls.' Mem.") 15-19).[5]   To be sure, Plaintiffs cannot "bridge the gap" by developing other frozen dinners, as they are contractually foreclosed from doing so.  (Settlement Agreement § 2(c)).  Nevertheless, Plaintiffs have (at this stage) established enough proximity of the relevant products, as Barefoot Contessa and "Contessa Chef Inspired" dinners have — and continue to — appear side by side in grocery stores, and, in any event, Barefoot Contessa's continued production of specialty grocery store items are in a similar category to the infringing goods.  *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003) ("[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source.").  Nor are the different labels affixed to the packages adequate to distinguish them in the minds of consumers, as "labels alone cannot insulate an infringer," *Samara Bros. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 128 (2d Cir. 1998), *rev'd on other grounds*, 529 U.S. 205 (2000) — a proposition that carries particular weight here, given the similarities between the labels themselves.

## B.  Irreparable Harm

In addition, the Court finds that Plaintiffs have adequately established irreparable harm. As discussed at the February 24th conference, the parties dispute whether, after *eBay*, 547 U.S. at 393, and *Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010), a court may still presume irreparable harm in Lanham Act cases upon a showing of consumer confusion.  *Compare Coach, Inc. v. O'Brien*, No. 10-CV-6071 (JPO) (JLC), 2012 WL 1255276, at *17 (S.D.N.Y. Apr. 13,

---

[5]      In this regard, Plaintiffs have also shown a likelihood of success on their claim that Defendants breached the Settlement Agreement (Pls.' Mem. 21), as the Agreement explicitly requires Contessa Premium — along with Defendants, as its successors and assigns — to "make all efforts to avoid confusion" between Contessa Premium and Garten and to not use any design element in combination with the word "Contessa" that would be likely to create consumer confusion between Contessa Premium and Garten.  (Settlement Agreement §§ 3(e), 8.)

2012) ("The first *eBay* factor, irreparable harm, is automatically satisfied by actual success on the merits, as irreparable harm is established by a showing of likelihood of confusion." (internal quotation marks omitted)), *with  U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011) ("In light of *Salinger*'s clarification that . . . a court deciding whether to issue an injunction must not adopt categorical or general rules or presume that a party has met an element of the injunction standard, the presumption of irreparable injury in trademark cases is no longer appropriate." (internal citation and quotation marks omitted)), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).  Nevertheless, the Court need not decide the issue, because — on the record currently before the Court, which includes evidence of actual consumer (and retailer) confusion — Plaintiff has established irreparable harm.  *See Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (even absent a presumption of irreparable injury, "a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury").

Courts have consistently "found irreparable harm to exist in situations where there is a likelihood of confusion between the marks, and where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the infringement." *Microban Prods. Co. v. API Indus., Inc.*, No. 14-CV-41 (KPF), 2014 WL 1856471, at *21 (S.D.N.Y. May 8, 2014).  That is because where "the party seeking the injunction shows that it will lose control over the reputation of its trademark . . .  loss of control over one's reputation is neither calculable nor precisely compensable."  *NYP Holdings v. N.Y. Post Pub'g Inc.*, No. 14-CV-8310 VM, — F. Supp. 3d —, 2014 WL 6603989, at *11 (S.D.N.Y. Nov. 17, 2014).  That is the case here.  Plaintiffs, and Garten more specifically, have spent almost thirty-five years — and millions of dollars in advertisement and marketing — building the Barefoot Contessa brand. (Garten Decl. ¶¶ 8, 10-12, 16).  Additionally, Garten claims that she has been "extremely careful

to associate the Barefoot Contessa brand with a handful of products for which [she has] total creative input and absolute control over design and quality, to ensure that any products bearing the brand and [her] name reflect [her] core values and high standards" (*id.* ¶ 14) — an assertion supported by her refusal to enter into a licensing agreement with Defendants after they acquired the assets of Contessa Premium because of her concerns regarding their inexperience in the frozen meals sector.  Plaintiffs' control over products associated with Barefoot Contessa is imminently threatened by the "Contessa Chef Inspired" trade dress that is strongly similar — if not virtually identical to — the Frozen Dinner Trade Dress, particularly in light of the fact that the two products have appeared side-by-side in grocery stores, and have both been labeled "Barefoot Contessa" products by grocery stores.  (Garten Supplemental Decl., Exs. A-C).

The Court is unpersuaded by Defendants' contention that Plaintiffs have not shown irreparable injury because, by virtue of the Settlement Agreement, they are no longer competitors in the relevant market, which Defendants define narrowly to constitute frozen meals.  *See, e.g.*, *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980).  Although Plaintiffs no longer compete with Defendants in the frozen meals market *per se*, they do compete in the larger food products market.  *See id*. ("Although Johnson's Baby Oil and Lotion do not compete with NAIR in the narrower depilatory market, they do compete in the broader hair removal market.").  In that regard, Defendants' continued use of the Frozen Dinner Trade Dress imminently threatens Plaintiffs' goodwill among consumers who look for the Barefoot Contessa brand in making general grocery purchasing decisions.

## C.  The Balance of Hardships and Public Interest

Finally, assuming *arguendo* that Plaintiffs must show that the balance of hardships tips in their favor and that a temporary restraining order is in the public interest, they have done so.  The

Court is mindful that, after Contessa Premium's liquidation in 2014, Defendants have been struggling to build a new consumer base, and that OFI may suffer financial and reputational harm from a cessation of production.  (Handford Decl. ¶ 9).  At the same time, Defendants only started distribution of their "Contessa Chef Inspired" line of products last month.  (*Id.* ¶ 6).  Moreover, as noted above, Plaintiffs also face a significant loss of consumer goodwill from continued sales of infringing products, as they have already received complaints regarding both counterfeit Barefoot Contessa frozen meals and "Contessa Chef Inspired" meals.  And the temporary injunctive relief granted by the Court (*see* Docket No. 28) does not include a recall, one of the remedies Defendants contend would devastate their business; instead, the Court's order merely pauses existing production and shipping of infringing products — thereby restoring the parties to the status quo that existed before Defendants began production of the allegedly infringing goods — pending the preliminary injunction hearing in two weeks.  (*Id.*).[6]

Lastly, the harm Defendants face is, to a large extent, self-inflicted.  After being refused a license from Plaintiffs, Defendants took a calculated risk in launching a product with a trade dress virtually identical to the trade dress that was used in the previously licensed line of

---

[6]     Although Plaintiffs seek a recall of "Contessa Chef Inspired" products only as part of their request for a preliminary injunction, not as part of their motion for a temporary restraining order, it is worth noting now that the Court is skeptical that Plaintiffs can prevail on that score. Courts have repeatedly stressed that a recall is an "extreme remedy," *Conopco, Inc. v. 3DO Co.*, No. 99-CV-10893 (JSM), 1999 WL 1277957, at *3 (S.D.N.Y. Dec. 7, 1999), one for which a court may consider the "defendant's good faith or bad faith, the likelihood of diversion of customers from plaintiff to defendant, the extent of the burden entailed in a recall including the breadth of distribution and the shipping costs, and the probability that the plaintiff would benefit from such an order," *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 322 (S.D.N.Y. 1999).  On the record before it, the Court is not prepared to hold — or even suggest — that Defendants acted in bad faith given, among things, their belief that Plaintiffs did not own the Frozen Dinner Trade Dress and their efforts to remove Garten's likeness and all other Barefoot Contessa registered trademarks from the "Contessa Chef Inspired" packaging.  (*Compare* Garten Decl., Ex. E *with id.*, Ex. I).  The lack of bad faith, coupled with the burden a recall would impose on Defendants, counsels against finding that a recall would be appropriate.

products.  (*See* Handford Decl. ¶ 9 (acknowledging that Defendants "launched the Contessa Chef Inspired Products because Barefoot Contessa refused to license its trademarks to [them], and there are always difficulties in launching a new brand")).  In doing so, they proceeded at their peril.  *Cf. SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.*, 63 F. Supp. 2d 467, 472 (S.D.N.Y. 1999), *amended*, No. 99-CV-9214 (DC), 1999 WL 1122478 (S.D.N.Y. Sept. 20, 1999) *and order dissolved due to a change in circumstances*, No. 99-CV-9214 (DC), 1999 WL 1243894 (S.D.N.Y. Dec. 22, 1999) (finding that the balance of equities favored the plaintiff despite the fact that the defendant "would suffer substantial financial losses if its launch of the product is delayed," because "[a]ny harm that [defendant] would suffer by the issuance of a preliminary injunction is largely the result of its own doing.").  As for whether a temporary restraining order is in the public interest, "[t]he consuming public has a protectable interest in being free from confusion, deception and mistake." *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541; *see also Tecnimed*, 763 F. Supp. 2d at 417 (finding that the public interest is served "by removing confusing trade dress from the marketplace.").

**D.  Trademark Infringement and Violation of the Sell-Through Agreement**

As a final matter, the Court turns to Plaintiffs' argument that Defendants have also committed trademark infringement and breached the Sell-Through Agreement, insofar as there is evidence to suggest that they are selling "counterfeit" Barefoot Contessa frozen meals and selling genuine Barefoot Contessa meals past the Sell-Through Agreement's expiration date.  *See Ryan v. Volpone Stamp Co*., 107 F. Supp. 2d 369, 381 (S.D.N.Y. 2000) ("[T]he continued use by the defendants of a licensed trademark after the Franchise Agreement had been terminated constitutes trademark infringement as well as a breach of contract." (internal quotation marks and alteration omitted)).  Significantly, although Defendants dispute the extent of such conduct,

they do not really dispute that they are selling some Barefoot Contessa frozen meals in violation of the Sell-Through Agreement (or that such conduct would warrant injunctive relief). Accordingly, the Court concludes that Plaintiffs are also entitled to temporary injunctive relief as to any sales of either genuine or counterfeit frozen meals bearing the Barefoot Contessa mark.[7]

## CONCLUSION

For the reasons stated above, the Court granted Plaintiffs' request for a temporary restraining order, the scope of which is delineated in the Court's Order of February 25, 2015. (Docket No. 28).  Pursuant to Rule 65(b)(2) of the Federal Rules of Civil Procedure, absent an extension, the Court's order expires in the afternoon of March 11, 2015.

As stated on the record at the conference of February 25, 2015, the parties are to submit any proposed findings of fact and conclusions of law no later than **March 6, 2015**, and are to appear for the preliminary injunction hearing at 9:30 a.m. on **March 11, 2015**.   At that time, the Court will conduct a full evidentiary hearing on the issues discussed herein — assuming that the parties have not mutually resolved the claims underlying Plaintiffs' demand for preliminary injunctive relief.


        SO ORDERED.

Date:  February 26, 2015
       New York, New York


                                                    JESSE M. FURMAN
                                                United States District Judge

---

[7]     Although Plaintiffs seek injunctive relief in connection with other claims (*see* Pls.' Mem. 19-22), the Court need not address them now, as the claims discussed above are sufficient to justify the temporary injunctive relief requested by Plaintiffs in their Order to Show Cause.

17